(143 P.3d 74)
No. 94,667

SANDRA TROUTMAN, LARRY GALES, and GERALD CROOKS, *Appellants*, v. JEFFREY CURTIS, M.D., STORMONT VAIL HEALTHCARE, INC., and PERCLOSE, INC., *Appellees*.

Opinion filed September 22, 2006.

*J. Todd Hiatt, Eugene B. Ralston*, and *Kevin L. Diehl*, of Ralston, Pope & Diehl, L.L.C., of Topeka, for appellants.

*Donald Patterson*, of Fisher, Patterson, Sayler & Smith, LLP, of Topeka, and *Brian J. Mooney*, of Gordon & Rees LLP, of San Francisco, California, for appellee Perclose, Inc.

Before MALONE, P.J., ELLIOTT and CAPLINGER, JJ.

MALONE, J.: This is a products liability case in which Sandra Troutman, Larry Gales, and Gerald Crooks (plaintiffs) suffered complications following cardiac catheterization procedures performed by Jeffrey Curtis, M.D., at Stormont-Vail HealthCare, Inc. (Stormont-Vail). The plaintiffs alleged Perclose, Inc. (Perclose) was negligent in the design, manufacturing, and labeling of its product, the Closer Mediated Closure System (the Closer). The Closer is a

Class III prescription medical device designed to deliver a polyester suture to close the femoral artery access site following a catheterization procedure. Perclose moved for summary judgment on the basis that the plaintiffs' claims were expressly preempted by federal law. The district court granted the motion.

This case presents an issue of first impression in Kansas. It requires us to determine the scope of the preemption provision set forth in 21 U.S.C. § 360k(a) (2000) of the 1976 Medical Device Amendments (MDA) to the 1938 Food, Drug, and Cosmetic Act, 21 U.S.C. § 301 *et seq.* (2000 ed. & Supp. III 2003). Specifically, we must decide whether § 360k(a) preempts state common-law tort claims alleging liability as to Class III medical devices that have entered the market pursuant to the Food and Drug Administration's (FDA) rigorous premarket approval (PMA) process. We join the growing consensus of legal authority across the United States and hold that state common-law tort claims alleging liability as to a PMA-approved Class III medical device are preempted by § 360k(a), except for a claim that the manufacturer failed to comply with the approved federal standards. We further hold that the plaintiffs failed to come forward with any evidence to support a claim that Perclose failed to comply with the approved federal standards in the design, manufacturing, and labeling of the Closer. Accordingly, we affirm the district court's granting of summary judgment in favor of Perclose.

## Factual and procedural background

In granting summary judgment, the district court found the following facts to be uncontroverted. The district court's factual determinations have not been challenged on appeal and are summarized as follows:

1. In 2000 and 2001, the plaintiffs underwent cardiac catheterization procedures for diagnostic purposes performed by Dr. Curtis at Stormont-Vail. Each catheterization was closed, using the Closer, manufactured by Perclose. Complications occurred following each catheterization.

2. The Closer is a Class III prescription medical device designed to deliver a polyester suture to close the femoral artery access site following a catheterization procedure.

3. Class III devices are those devices which are to be used for supporting or sustaining human life, or are of substantial importance in preventing impairment of human health, or present a potential unreasonable risk of illness or injury. These devices are subject to the FDA's most stringent regulations.

4. To be approved by the FDA, Class III devices are subject to either the less stringent § 510(k) (the original MDA section designation) premarket notification process, if the device is substantially equivalent to a medical device already on the market prior to enactment of the MDA in 1976, or the more rigorous PMA process.

5. Perclose initially requested approval of the predecessor to the Closer, the Prostar Percutaneous Vascular Surgical Device (Prostar), under the § 510(k) premarket notification process. However, on October 24, 1996, the FDA denied that request, requiring that the Prostar be subjected to the more rigorous PMA process.

6. On November 26, 1996, Perclose applied for PMA of the Prostar, which was approved on April 30, 1997, subject to several conditions which were ultimately met.

7. On May 1, 1997, Perclose submitted PMA Supplement No. 1 seeking approval of the Techstar 6 French Percutaneous Vascular Surgical System (Techstar), a modified version of the original Prostar device. The FDA approved this design modification on November 5, 1997.

8. From 1997 to 1999, Perclose submitted a series of PMA Supplements commensurate with various modifications to its closure device, eventually submitting PMA Supplement No. 19 in May 1999, seeking approval for the Closer.

9. With the submission of PMA Supplement No. 19, Perclose also introduced design modifications to the approved Perclose Knot Pusher, Perclose Mini Knot Pusher, and Perclose Snared Knot Pusher, as well as the Clincher Knot Tying Device, a new accessory device that would automatically tie a sliding surgical knot in the suture.

10. Thereafter, Perclose submitted four amendments to PMA Supplement No. 19 for the Closer on June 22, October 12, No-

vember 2, and November 17, 1999, respectively. On November 22, 1999, the FDA approved the Closer and its accessories.

11. Perclose submitted a fifth amendment to PMA Supplement No. 19 on November 24, 1999, which included copies of the final approved labeling. In January 2002, the FDA reviewed the labeling and confirmed that Perclose could proceed with distribution and marketing of the Closer.

12. As part of the process for approval, the Closer, through its predecessors, Prostar and Techstar, underwent extensive clinical investigation. In total, before the Closer was approved by the FDA, over 1,600 patients were studied at over 30 institutions in the United States and Europe over a span of 6 years, in order to establish both safety and efficacy.

13. Two of the first clinical studies, which were submitted with the original PMA for the Prostar, were performed between October 1993 and March 1996: the Prostar Feasibility Study and the Prostar Investigational Device Exemption.

14. Perclose provided two clinical studies in submitting PMA Supplement No. 19 for the Closer: The Closer Percutaneous Vascular Surgical Device European Trial Feasibility Study and The Closer Percutaneous Vascular Surgical Device European Trial. Prior to approval of the Closer on November 22, 1999, the FDA reviewed the clinical studies submitted by Perclose.

15. On October 27, 1999, subsequent to the submission of PMA Supplement No. 19, in an attempt to finalize the labeling for the Closer, the FDA made the request that the final labeling for the Closer also include the adverse events and clinical trial summary from the STAND I Trial (a multi-center study designed to prospectively examine the safety and effectiveness of femoral artery closure using the Techstar).

16. The FDA determined that the STAND I Trial should be included in the labeling for the Closer, even though it evaluated a predecessor design to the Closure, explaining that the Closer is a design evolution of the Techstar. Thus, the results of the STAND I Trial are applicable to the Closer because of equivalent intended use and basic operating principles.

17. In submitting the Closer's design specifications to the FDA, Perclose submitted PMA Supplement No. 19, which included detailed explanations of the design and use of the Closer, including details on the suture, sheath, foot, guide, handle, and needle plunger. It also identified the use of the Tevdek polyester suture, which was previously the subject of its own submissions to the FDA by Howmedica, Inc., and approved by the FDA on December 22, 1982.

18. PMA Supplement No. 19 specified that the suture used by the Closer is a nonabsorbable polyester suture. It also provided details regarding procedural steps necessary to use the Closer, including deployment and postangiogram care.

19. The FDA approved the design of the Closer as safe and effective.

20. Perclose also provided detailed information as to the manufacture of the Closer in PMA Supplement No. 19. This manufacturing process was considered, revised, and ultimately approved by the FDA.

21. Labeling for the Closer was also approved by the FDA, which included substantial information regarding the device and its safety effectiveness.

22. The only document Perclose was required to provide with the Closer was a package insert, which Perclose entitled Instructions for Use. These instructions were detailed in the PMA Supplement No. 19 and the amendments thereto.

23. The Closer's instructions for use provided, under clear headings, a description of the Closer, the indications for use of the device, contraindications, warnings, precautions, and special patient populations.

24. Although not required by the FDA, Perclose also included in the packaging for the Closer, a patient guide providing additional information and home care instructions on the Closer, which could be provided to the patient should the physician decide to do so. Because the patient guide was to be included in the package with each Closer, it had to be approved and was approved by the FDA.

On October 23, 2003, the plaintiffs filed a petition against Curtis, Stormont-Vail, and Perclose. As to Perclose, the plaintiffs asserted

state law claims that Perclose was "negligent in its design, testing, inspection, manufacturing, sale, [and] warning post and pre-sale" of the Closer. The plaintiffs also alleged Perclose was strictly liable for their injuries. Perclose filed a motion for summary judgment seeking dismissal of all claims based on federal preemption.

On August 13, 2004, the district court granted Perclose's motion for summary judgment. The district court determined that the FDA, through the PMA process, established device-specific requirements for the Closer and the plaintiffs' claims based upon state law theories of liability were inconsistent with those requirements. The district court subsequently denied a motion for reconsideration. The plaintiffs requested an interlocutory appeal which this court denied. Thereafter, the plaintiffs dismissed with prejudice their claims against Dr. Curtis and Stormont-Vail, resulting in a final judgment. The plaintiffs timely filed a notice of appeal.

## Standard of review

" ' "Summary judgment is appropriate when the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. The trial court is required to resolve all facts and inferences which may reasonably be drawn from the evidence in favor of the party against whom the ruling is sought. When opposing a motion for summary judgment, an adverse party must come forward with evidence to establish a dispute as to a material fact. In order to preclude summary judgment, the facts subject to the dispute must be material to the conclusive issues in the case. On appeal, [an appellate court must] apply the same rules and where . . . reasonable minds could differ as to the conclusions drawn from the evidence, summary judgment must be denied." [Citations omitted.]' " *State ex rel. Stovall v. Reliance Ins. Co.*, 278 Kan. 777, 788, 107 P.3d 1219 (2005).

Where facts are not in dispute, appellate review of an order regarding summary judgment is de novo. *Roy v. Young*, 278 Kan. 244, 247, 93 P.3d 712 (2004).

## Federal preemption

The plaintiffs claim the district court erred in granting Perclose's summary judgment motion on the basis of federal preemption. According to the plaintiffs, the MDA does not preempt state law remedies, as incorporated in the Kansas Product Liability Act

(KPLA), K.S.A. 60-3301 *et seq.* The KPLA applies to any claim for harm caused by the design, manufacturing, or labeling of a product, and the KPLA incorporates such common-law claims as strict liability in tort, negligence, breach of express or implied warranty, and failure to discharge a duty to warn. K.S.A. 60-3302(c). The plaintiffs argue the district court erred in finding that the FDA, through the PMA process, established device-specific requirements for the Closer and that the plaintiffs' claims, based upon state law theories of liability, are inconsistent with the FDA requirements.

The doctrine of federal preemption is founded in the Supremacy Clause of the United States Constitution:

"This Constitution, and the Laws of the United States which shall be made in Pursuance thereof . . . shall be the supreme Law of the Land; and the Judges in every State shall be bound thereby, any Thing in the Constitution or Laws of any State to the Contrary notwithstanding." U.S. Const. art. VI, cl. 2.

Under the Supremacy Clause, state laws that conflict with federal laws are without effect. *Cipollone v. Liggett Group, Inc.*, 505 U.S. 504, 516, 120 L. Ed. 2d 407, 112 S. Ct. 2608 (1992). There is a presumption against federal preemption of state law. To federally preempt state law, Congressional intent must be clear. *Medtronic, Inc. v. Lohr*, 518 U.S. 470, 485, 135 L. Ed. 2d 700, 116 S. Ct. 2240 (1996).

Congressional intent supporting federal preemption may be either express or implied:

"Congress' intent may be 'explicitly stated in the statute's language or implicitly contained in its structure and purpose.' [Citation omitted.] In the absence of an express congressional command, state law is pre-empted if that law actually conflicts with federal law [citation omitted], or if federal law so thoroughly occupies a legislative field " 'as to make reasonable the inference that Congress left no room for the States to supplement it.' " [Citations omitted.]" *Cipollone*, 505 U.S. at 516.

## Overview of the MDA

The FDA regulates the marketing and sale of prescription medical devices in the United States pursuant to the MDA. "Congress enacted the MDA of 1976, in the words of the statute's preamble, 'to provide for the safety and effectiveness of medical devices in-

tended for human use.' 90 Stat. 539." *Lohr*, 518 U.S. at 474. The FDA has enacted regulations to enforce the MDA, which are found at 21 C.F.R. § 800 *et seq.* (2006).

In enacting the MDA, Congress intended to expand the authority of the FDA to regulate medical devices, while also protecting innovations in device technology from being "stifled by unnecessary restrictions." See H.R. Rep. No. 94-853, 94th Cong., 2d Sess., at 12 (1976); *Lohr*, 518 U.S. at 490. Specifically, by enacting the preemption provision, Congress attempted to shield medical devices from undue burdens imposed by differing state regulations and recognized that "if a substantial number of differing requirements applicable to a medical device are imposed by jurisdictions other than the Federal government, interstate commerce would be unduly burdened." H.R. Rep. No. 94-853, at 45; see *Riegel v. Medtronic, Inc.*, 451 F.3d 104, 122-23 (2d Cir. 2006).

The MDA classifies medical devices into three separate and distinct categories based upon the potential risks to the public. Class I medical devices are those which generally pose little or no threat to public health or safety; *e.g.*, tongue depressors, bedpans, stretchers, and scissors. Class I devices are subject only to "general controls" by the FDA. See 21 U.S.C. § 360c(a)(1)(A) (2000); *Lohr*, 518 U.S. at 476-77. Class II medical devices are more complex than Class I devices and are subject to more stringent "special controls" by the FDA; *e.g.*, oxygen masks, syringes, and hearing aids. These devices pose greater risks to health and safety. See 21 U.S.C. § 360c(a)(1)(B); *Lohr*, 518 U.S. at 477. Class III devices are those devices for which there is insufficient information to determine that Class I or Class II controls are enough, standing alone, to provide reasonable assurance of the device's safety and effectiveness; *e.g.*, pacemakers, bone screws, and vascular devices. Class III devices are to be used for "supporting or sustaining human life" or are of "substantial importance in preventing impairment of human health" or present "a potential unreasonable risk of illness or injury." These devices are subject to the FDA's strictest regulations. See 21 U.S.C. § 360c(a)(1)(C); *Lohr*, 518 U.S. at 477.

Before a Class III medical device can be sold commercially in the United States, the manufacturer must provide the FDA with

a reasonable assurance that the device is both safe and effective. See 21 U.S.C. § 360e(d)(2) (2000). To meet this requirement, a new device is subject to either (1) the premarket notification process, known as the § 510(k) process, or (2) the PMA process. *Buckman Co. v. Plaintiffs' Legal Comm.*, 531 U.S. 341, 344-45, 148 L. Ed. 2d 854, 121 S. Ct. 1012 (2001). Under the § 510(k) process, if the FDA concludes on the basis of a manufacturer's premarket notification that the applicant's Class III medical device is "substantially equivalent" to a preexisting device, the MDA permits marketing of the device without further regulatory analysis. See 21 U.S.C. § 360e(b)(1)(B). The less stringent § 510(k) process only requires the manufacturer to submit limited information concerning the device, and the FDA spends only about 20 hours reviewing a solicitation submitted under this process. *Buckman*, 531 U.S. at 345-46; *Lohr*, 518 U.S. at 478-79.

On the other hand, for the PMA process, "[m]anufacturers must submit detailed information regarding the safety and efficacy of their devices, which the FDA then reviews, spending an average of 1,200 hours on each submission." *Lohr*, 518 U.S. at 477. Once the FDA has approved a medical device through the PMA process, the applicant is required to comply with the standards in the PMA approval order. 21 C.F.R. § 814.80 (2006). Any changes the applicant wishes to make must be submitted through an additional PMA supplement for approval. 21 C.F.R. § 814.39(a) (2006). The FDA has the power to withdraw approval of a medical device if it determines that the design of such a device does not conform with the applicable regulations. See 21 U.S.C. § 360e(e).

As previously noted, it is undisputed that the Closer is a Class III device that was subjected to the more rigorous PMA process before it was granted FDA approval. The vast majority of Class III medical devices, however, reach the market through the less rigorous § 510(k) premarket notification process. As noted by the court in *Riegel*:

"Indeed, from the FDA's website, it appears that in the fiscal year 2005, out of the 3,180 new Class III devices that were permitted to enter the market through either the § 510(k) or PMA processes, 3,148 of them went through the § 510(k) process and only 32 went through the PMA process. In other words, in 2005,

approximately ninety-nine percent of such devices went through the § 510(k) process and only *one percent* went through the PMA process." 451 F.3d at 111-12.

## *The preemption provision*

Congress attempted to shield medical devices from undue burdens imposed by differing state regulations by including in the MDA an express preemption provision, 21 U.S.C. § 360k(a) (2000), which provides:

"(a) General rule
"Except as provided in subsection (b), no State or political subdivision of a State may establish or continue in effect with respect to a device intended for human use any requirement—
(1) which is different from, or in addition to, any requirement applicable under this chapter to the device, and
(2) which relates to the safety or effectiveness of the device or to any other matter included in a requirement applicable to the device under this chapter."

This provision appears straightforward, although its interpretation and application have proven otherwise. The FDA has promulgated regulations implementing § 360k(a), which state:

"State or local requirements are preempted only when the [FDA] has established specific counterpart regulations or there are other specific requirements applicable to a particular device under the act, thereby making any existing divergent State or local requirements applicable to the device different from, or in addition to, the specific [FDA] requirements." 21 C.F.R. § 808.1(d) (2006).

## *Medtronic, Inc. v. Lohr*

21 U.S.C. § 360k(a) was interpreted by the United States Supreme Court in *Lohr*, 518 U.S. 470, where the plaintiffs brought various state law tort claims regarding the design, manufacturing, and labeling of a pacemaker that had entered the market pursuant to the § 510(k) process. The Court unanimously determined there was no preemption on the negligent *design* claim because the FDA's "substantially equivalent" determination under the § 510(k) process did not amount to a specific federally enforceable design requirement that could not be affected by state law. The Court concluded that nothing in the statutory scheme or the legislative history suggested that the § 510(k) process was intended to do anything other than maintain the status quo, which included the

possibility that a device's manufacturer would have to defend itself against state negligent design claims. 518 U.S. at 492-94.

In considering the *manufacturing* and *labeling* claims, however, the Court fractured over two issues regarding the interpretation of § 360k(a). First, the justices diverged over whether the reference to "requirements applicable under this Act" meant that only device-specific requirements could give rise to preemption, or instead meant that any general FDA requirements could give rise to preemption. A majority of five justices concluded that only federal device-specific requirements could give rise to preemption. 518 U.S. at 497-500. The majority held that because the only FDA manufacturing and labeling requirements that covered the pacemaker at issue were general in nature rather than device-specific, the plaintiffs' manufacturing and labeling claims were not preempted. By contrast, the remaining four justices concluded that even general FDA requirements could give rise to preemption. 518 U.S. at 511-14 (O'Conner, J., concurring in part; dissenting in part).

In addition to the 5-4 split over whether the applicable federal requirement needed to be device-specific, the justices also divided over whether a state "requirement," as that term is used in § 360k(a), could derive from state common law or only from state statutes and regulations. On this issue, a different majority of five justices concluded that § 360k(a) preempts any state common-law action, as well as any state statute or regulation, that would impose a requirement different from or in addition to that applicable under the MDA. 518 U.S. at 509-11 (O'Conner, J., concurring in part; dissenting in part). By contrast, the other four justices adopted the view that only state statutes and regulations would typically give rise to a state requirement for purposes of preemption under the MDA. 518 U.S. at 502-03.

In reaching the conclusion that § 360k(a) preempts state common-law actions that would impose different or additional requirements, the majority adopted its prior holding in *Cipollone*, 505 U.S. at 522. In *Cipollone*, the United States Supreme Court found that the Federal Cigarette Labeling and Advertising Act (FCLAA) preempted state tort law claims, and the Court rejected the plaintiff's argument that common-law claims do not amount to positive en-

actments. "[C]ommon law damages actions of the sort raised by petitioner are premised on the existence of a legal duty and it is difficult to say that such provisions do not impose 'requirements or prohibitions.' " *Cipollone*, 505 U.S. at 522.

Thus, *Lohr* has established a two-pronged approach on the issue of preemption under § 360k of the MDA. First, on the federal side of the analysis, courts must consider whether there are any device-specific federal requirements with respect to the medical device at hand. If so, courts must then turn to the state side to determine whether there would be a conflict between that device-specific federal requirement and "any of the liability-creating premises of the plaintiffs' state-law tort suit." 518 U.S. at 508 (Breyer, J., concurring in part and concurring in judgment). In *Lohr*, the Court left open the question in the present case, which is whether FDA approval pursuant to the PMA process for a Class III medical device constitutes imposition of a "device-specific federal requirement" within the meaning of § 360k(a), thereby preempting state law tort claims. 518 U.S. at 502-03.

## Post-Lohr case law

Since *Lohr*, there has been a split in authority regarding whether § 360k(a) preempts state law tort claims in which damages are sought for alleged defective medical devices that have received PMA approval. The Second, Third, Fifth, Sixth, Seventh, and Eighth Circuit Courts of Appeals have held that claims regarding PMA-approved medical devices are preempted, at least as to common-law claims that allege the approved product design is defective or unreasonably dangerous or that allege the approved labeling or warnings are inadequate. See *Riegel*, 451 F.3d at 123; *Cupek v. Medtronic, Inc.*, 405 F.3d 421 (6th Cir. 2005); *McMullen v. Medtronic, Inc.*, 421 F.3d 482 (7th Cir. 2005); *Horn v. Thoratec Corp.*, 376 F.3d 163 (3d Cir. 2004); *Martin v. Medtronic, Inc.*, 254 F.3d 573 (5th Cir. 2001), *cert. denied* 534 U.S. 1078 (2002); *Brooks v. Howmedica, Inc.*, 273 F.3d 785 (8th Cir. 2001), *cert. denied* 535 U.S. 1056 (2002); *Kemp v. Medtronic, Inc.*, 231 F.3d 216 (6th Cir. 2000); *Mitchell v. Collagen Corp.*, 126 F.3d 902 (7th Cir. 1997). These circuits have all concluded that (1) approval through the

PMA process, unlike the § 510(k) process, amounts to a federal device-specific requirement and (2) common-law tort actions that allege liability as to a PMA-approved device, notwithstanding that device's compliance with the PMA-approved standards, would conflict with that federal device-specific requirement.

However, the Eleventh Circuit Court of Appeals has reached a contrary conclusion. See *Goodlin v. Medtronic, Inc.*, 167 F.3d 1367 (11th Cir. 1999) (holding that the PMA process does not impose specific federal requirements because government permission to market a device does not fit within the preemptive provision of a requirement). The plaintiffs also cite *Oja v. Howmedica, Inc.*, 111 F.3d 782, 789 (10th Cir. 1997), in which the court held that state common-law claims of negligent failure to warn and negligent manufacture were not state requirements "specifically developed 'with respect to' medical devices" and therefore were not preempted under § 360k(a). However, *Oja* involved a § 510(k)-approved Class II medical device and, thus, is clearly distinguishable from the present case. The court's analysis in *Oja* has been rejected by the majority of circuit courts in subsequent cases involving PMA-approved medical devices.

The decisions on both sides of the issue are well reasoned. Many of the decisions include dissenting opinions which indicate the courts' separation on this issue. "The substantive split among the circuit courts mirrors a methodological difference: the majority focuses on the rigor of the PMA process and often restrictive post-approval conditions, whereas the minority focus on congressional intent as expressed in the statute." *Webster v. Pacesetter, Inc.*, 171 F. Supp. 2d 1, 9 (D.D.C. 2001)

### Kansas case law

Kansas appellate courts have not addressed the specific issue of preemption under 21 U.S.C. § 360k(a) of the MDA. However, the Kansas Supreme Court has determined that the requirements of the Federal Insecticide, Fungicide, and Rodenticide Act (FIFRA), 7 U.S.C. § 136 *et seq.* (2000), preempts state common-law claims regarding a failure to warn. *Jenkins v. Amchem Products, Inc.*, 256 Kan. 602, 625, 886 P.2d 869 (1994), *cert. denied* 516 U.S. 820

(1995). In *Jenkins*, a farmer brought a products liability action against herbicide manufacturers, alleging that his long-term use of a chemical caused or contributed to his development of non-Hodgkins lymphoma. The district court granted summary judgment in favor of defendants, finding that FIFRA preempted state law claims based upon inadequate labeling and failure to warn.

The Kansas Supreme Court affirmed. 256 Kan. at 625, 637. Relying primarily on the United States Supreme Court holding in *Cipollone*, 505 U.S. at 522, the court determined that a common-law tort claim which challenged the labeling or packaging of products governed by FIFRA constituted a "requirement for labeling or packaging" barred by 7 U.S.C. § 136v(b) (1988). 256 Kan. at 618. The court concluded:

"[I]t is clear that § 136v(b) of FIFRA preempts state law damages actions which impose labeling requirements beyond the FIFRA requirements. Negligent failure to warn claims and strict liability failure to warn claims necessarily impose requirements concerning labeling because to avoid liability a manufacturer would alter the labels affixed to its products; therefore, such claims are preempted under FIFRA. . . . Because all failure to warn claims are preempted under FIFRA, plaintiff has no claim which survives preemption." *Jenkins*, 256 Kan. at 625.

While the holding in *Jenkins* does not control the outcome of this case, the language of the court's decision clearly supports Perclose's argument in favor of federal preemption. In *Jenkins*, the Kansas Supreme Court followed the majority view that a common-law tort claim can impose a "requirement" different from applicable federal regulations. Also, as to FIFRA, the court found clear evidence of Congressional intent to completely preempt state authority in regard to labeling and packaging. 256 Kan. at 614-15.

### Application of Lohr's two-pronged test

We now turn to the primary issue of whether the district court erred in dismissing the plaintiffs' claims against Perclose based on federal preemption. Following the test set forth by the United States Supreme Court in *Lohr*, our analysis proceeds in two steps. First, we must consider whether a device such as the Closer which has obtained approval pursuant to the PMA process is subject to a federal device-specific requirement. Second, we must analyze the

plaintiffs' tort claims to determine whether there is a conflict between that federal device-specific requirement and "any of the liability-creating premises of the [plaintiffs'] state-law tort suit." *Lohr*, 518 U.S. at 508 (Breyer, J., concurring in part and concurring in judgment).

We agree with the majority of courts that have held that PMA-approved medical devices are subject to federal device-specific requirements. The majority view emphasizes the rigors of the FDA process and recognizes that "[a]pproval by the FDA constitutes approval of the product's design, testing, intended use, manufacturing methods, performance standards and labeling" and is "specific to the product." *Mitchell*, 126 F.3d at 913. The majority view emphasizes the thorough nature of the PMA process and concludes that the PMA process itself imposes federal device-specific requirements upon the manufacturer:

> "There is no doubt that, as a practical reality, the PMA process imposed requirements that were specifically applicable to the [device], and that triggered preemption under § 360k(a). It imposed *mandatory conditions*—created through a decades-long process of correspondence, clinical testing and device alteration—pertaining to the [device's] manufacturing, packaging, storage, labeling, distribution and advertising. [Citations omitted.]" *Horn*, 376 F.3d at 170.

Here, in receiving approval for the Closer and its accessories, Perclose was subject to the rigorous PMA process. Through this process, Perclose was required to adhere to specific requirements in accordance with FDA rules and regulations. As part of the process for approval, the Closer, through its predecessors Prostar and Techstar, underwent extensive clinical investigations. In total, over 1,600 patients were studied at over 30 institutions in the United States and Europe over a span of 6 years, in order to establish both safety and efficacy. Before obtaining approval, Perclose was required to submit specific product design, testing, intended use, manufacturing methods, performance standards, and labeling information.

Subsequently, the FDA approved Perclose's PMA application for each of these areas; specifically the Closer's design, manufacturing methods, and warning labels. The FDA gave Perclose approval to distribute the Closer and its accessories, accompanied by

the warning labels, subject to stated "Conditions of Approval." Had the conditions of approval not been met, Perclose would not have been allowed to distribute the Closer and its accessories. Moreover, once the Closer obtained PMA approval, Perclose could not make any changes which would affect the safety and effectiveness of the device without further FDA approval. At that point, the device was clearly subject to the federal device-specific requirements of the FDA.

As to the first prong of the *Lohr* test, the district court concluded:

"The question before this Court, is whether the PMA process imposed specific requirements on Defendant in its design, manufacturing methods, and warning labels for the Closer. Prior to the development of the Closer, Defendant, over a period of many years, developed the Prostar and the Techstar through the PMA process. Each of these devices, along with the Closer, were required to undergo extensive clinical investigation, including patient and clinical studies. The design and manufacturing methods, along with the warning labels, were submitted to determine safety and effectiveness, and to ensure compliance with FDA regulations. The results of these tests and investigations were submitted to the FDA for approval, which was granted.

"Therefore, the Court finds that as a result of the rigorous PMA process, and in order to gain FDA approval, Defendant was required to meet specific requirements pertaining to the Closer, thus satisfying the first prong of the *Lohr* test."

We agree with the district court that the Closer, as a PMA-approved device, was subject to federal device-specific requirements in terms of complying with the particular standards set forth by the FDA. Accordingly, the first prong of the *Lohr* test has been satisfied in determining whether the plaintiffs' claims against Perclose are barred by federal preemption.

We next consider whether the plaintiffs' tort claims would, if successful, result in state "requirements" that differ from or add to the federal standards. We conclude that they would. As we have previously discussed, the United States Supreme Court has determined that the reference in 21 U.S.C. § 360k(a) to state "requirements" encompasses state common-law tort claims in addition to state statutes and regulations. See *Lohr*, 518 U.S. at 511 (O'Conner, J., concurring in part; dissenting in part); *Cipollone*, 505 U.S. at 522; see also *Bates v. Dow Agrosciences LLC*, 544 U.S.

431, 443, 161 L. Ed. 2d 687, 125 S. Ct. 1788 (2005) (Court determined that in interpreting the labeling and packaging provisions of FIFRA, the Fifth Circuit Court of Appeals had correctly held that the term "requirements" in 7 U.S.C. § 136v[b] [2000] reaches beyond positive enactments, such as statutes and regulations, to embrace common-law duties).

Nevertheless, the plaintiffs claim that the word "requirement" in § 360k(a) should not encompass state common-law remedies or remedies under the KPLA. According to the plaintiffs, the preemption doctrine applies only to positive enactments imposed by states such as statutes or regulations and not to common-law claims in a court of law. The plaintiffs argue, for example, that even if a manufacturer of a medical device lost against a negligence claim at trial, there would be no rule of law that would mandate or require that the manufacturer do or refrain from doing anything except for paying damages to the injured party. The plaintiffs assert the manufacturer would be free to continue producing its medical device with the same design, instructions, and manufacturing techniques as before the jury verdict.

A similar argument was recently rejected by the Second Circuit Court of Appeals in *Riegel*. In that case, a cardiac patient sued the manufacturer of a balloon catheter used in his angioplasty, asserting state law claims including strict liability, breach of implied warranty, and negligent design, testing, inspection, distribution, labeling, marketing, sale, and manufacture. The balloon catheter had been subject to PMA approval. In upholding summary judgment in favor of the manufacturer based on federal preemption, the court concluded that the tort claims would, if successful, impose state requirements that differed from or added to the PMA-approved standards for the balloon catheter. In support of this analysis, the court stated:

"Indeed, a verdict in the *Riegels'* favor on any of these claims would represent a finding that the Evergreen Balloon Catheter [medical device] had not adhered to the various state common law duties implicated by those claims, *e.g.*, that its design did not comport with the duty of due care, or that its labeling did not comport with the duty to warn. Such a verdict would clearly differ from the FDA's PMA approval of the device (and its related packaging, labeling, distribution, and so on)

as being reasonably safe and effective, and, moreover, from the FDA's prohibition against making any modifications affecting the device's safety and effectiveness without first obtaining FDA approval.

. . . .

"In fact, it is unclear what a manufacturer of a PMA-approved medical device would do when faced with such a jury verdict on a plaintiff's common law claims, given that the manufacturer would nonetheless be unable to make any modifications affecting the device's safety and effectiveness without obtaining further FDA approval. Moreover, it is certainly conceivable that different juries would reach conflicting verdicts about the same medical devices, thus rendering it almost impossible for a device to comply simultaneously with its federal PMA (which, after all, can only change after an extensive process) and with the various verdicts issued by different juries around the country.' " 451 F.3d at 122.

We agree with the court's analysis in *Riegel*. The plaintiffs' argument that a tort claim does not constitute a requirement under § 360k(a) ignores the realities of the effect of a jury verdict on manufacturing and commerce. For example, if a jury in this case found the Closer was defectively designed and awarded substantial damages to the plaintiffs, Perclose would obviously want to modify the Closer's design to avoid potential adverse jury verdicts in other cases. However, the design already complies with all standards and conditions imposed by the FDA after years of testing and study. In fact, Perclose is not permitted to modify the Closer's design without further approval by the FDA. Clearly, a successful tort claim against Perclose as to the Closer's design would amount to a state requirement that differs from or adds to the PMA-approved standards for the Closer. The same conclusion can be reached concerning the plaintiffs' claims as to the manufacturing and labeling of the Closer. Accordingly, the second prong of the *Lohr* test has been satisfied.

For these reasons, we hold that state common-law tort claims alleging liability as to a PMA-approved Class III medical device are preempted by 21 U.S.C. § 360k(a) (2000) of the MDA. We thus affirm the district court's order granting summary judgment to Perclose based on federal preemption. As we will discuss in the following section, however, federal preemption does not apply to a claim that the manufacturer of a medical device failed to comply

with the approved federal standards in the design, manufacturing, and labeling of the medical device.

### Failure to comply with approved federal standards

On appeal, the plaintiffs claim the district court erred in granting summary judgment on their claim that Perclose failed to comply with the approved federal standards in the design, manufacturing, and labeling of the Closer. The plaintiffs correctly assert that the MDA does not have any impact on claims that a manufacturer has failed to comply with the design, manufacturing process, and warning labels the manufacturer submits to the FDA. A manufacturer must abide by the FDA guidelines or face potential liability. The MDA clearly does not preempt state courts from hearing claims that a manufacturer violated the FDA requirements. "[W]hen a statute only preempts state requirements that are different from or in addition to those imposed by federal law, plaintiffs may still recover under state tort law when defendants fail to comply with the federal requirements." *National Bank of Commerce v. Kimberly-Clark Corp.*, 38 F.3d 988, 993 (8th Cir. 1994).

Perclose concedes that any claim that it failed to comply with FDA requirements in the design, manufacturing, and labeling of the Closer is not preempted by § 360k(a) of the MDA. However, Perclose maintains that the plaintiffs never asserted such a claim in district court. Thus, Perclose argues the plaintiffs cannot raise the claim for the first time on appeal. See *Board of Lincoln County Comm'rs v. Nielander*, 275 Kan. 257, 268, 62 P.3d 247 (2003).

A review of the record indicates that Perclose's assertion is correct. The plaintiffs' petition only alleged that Perclose was "negligent in its design, testing, inspection, manufacturing, sale, [and] warning post and pre-sale" of the Closer. The petition also alleged Perclose was strictly liable for the plaintiffs' injuries. However, the petition does not contain *any* allegations that Perclose failed to comply with FDA requirements. There is no mention in the record of any such claim until the plaintiffs filed their motion for reconsideration after the district court had granted summary judgment based on federal preemption.

Even if the plaintiffs' pleadings could be liberally construed to include a claim for noncompliance with federal standards, Perclose would still be entitled to summary judgment because the plaintiffs failed to come forward with any evidence to support such a claim. During discovery, Perclose submitted interrogatories requesting the plaintiffs to state the factual bases for any claims for relief. In their response, the plaintiffs did not provide any factual basis to support a claim against Perclose for failure to comply with approved federal standards. In order to defeat a motion for summary judgment, the nonmoving party must come forward with specific facts showing a genuine issue for trial. *Doughty v. CSX Transportation, Inc.*, 258 Kan. 493, 496, 905 P.2d 106 (1995).

The plaintiffs complain that summary judgment was granted in this case before discovery was complete. "Ordinarily, a summary disposition motion of a pending case before the district court should not be granted until discovery is complete. [Citation omitted.]" *Montoy v. State*, 275 Kan. 145, 149, 62 P.3d 228 (2003). Nevertheless, a defendant moving for summary judgment is entitled to prevail if a plaintiff's claim is not supported by any evidence of negligence. A party cannot avoid summary judgment on the mere hope that something may develop later during discovery or at trial. *Crooks v. Greene*, 12 Kan. App. 2d 62, 66, 736 P.2d 78 (1987).

Here, the plaintiffs came forward with no evidence in district court supporting a claim that Perclose failed to comply with the approved federal standards in the design, manufacturing, and labeling of the Closer. The plaintiffs did not even properly assert such a claim in their pleadings. Accordingly, the plaintiffs are precluded from raising this issue on appeal, and the district court did not err in granting summary judgment in favor of Perclose on all claims.

Affirmed.